No. 105.—JAMES MORRIS *et al.* plaintiffs in error, *vs.* WILLIAM J. UNDERWOOD *et al.* defendants.

[1.] The title to an office will not be tried in a proceeding of *quo warranto*, when, at the time of trial, the term of office is expired, and no judgment of *ouster* can be pronounced.

*Quo warranto*, in Whitfield Superior Court. Decided by Judge TRIPPE, October Term, 1855.

This was an information in the nature of a *quo warranto*, filed by William J. Underwood and others, against James Morris and others, to show why and by what authority they exercised the office of directors of the "Planters' & Mechanics' Bank of Dalton," and used the franchise of banking.

The affidavits of the relators set out sundry irregularities in the organization of said bank, and the election of defendants as directors.

It appeared that the term for which said directors were elected, expired in August, 1855, and a new election was then held; and this rule *nisi* came on to be heard and a rule absolute was granted October Term, 1855, requiring the defendants to answer the information.

To this order, granting the rule absolute, the defendants. excepted.

BROWN; MOORE, for plaintiffs in error.

WALKER, for defendants.

*By the Court.*—LUMPKIN, J. delivering the opinion.

[1.] A rule *nisi* was granted by the Judge of the Superior Court of Whitfield County, at the instance of William J. Underwood, Brodwell E. Wells and Richard H. Sapp, requiring James Morris, Robert Y. Cook, John Anderson, Richard C. Cook and William L. High, to show cause why an information, in the nature of a *quo warranto*, should not be filed. against them, calling upon them to show by what authority· they were exercising, as the directors of the Planters' & Me-chanics' Bank of Dalton, the franchise of banking. Upon the hearing in October last, the rule was made absolute; and the bill of exceptions is filed to this decision.

The Legislature of 1853–'4, incorporated the Planters' & Mechanics' Bank of Dalton. (*See Pamphlet Acts, p.* 188.) The corporators were William J. Underwood, Owen H. Kenan, William L. High, Euclid Waterhouse and James Morris, and such other persons as they might procure, to take stock under the charter. The capital of the bank was $150.-000, with the privilege of increasing it to $250.000. The stock was divided into shares of $100 each, and appropriated among the aforesaid stockholders, and such other persons as they might associate with them. The affairs of the corporation were to be managed by five directors, to be elected by the stockholders as soon as specie to the amount of $10.000 was paid in. The directors first elected, were to serve until the first Monday in April, 1855, and were to be elected, annually, on the same day thereafter. They were to be elected by a majority of the votes given in; and if the stockholders. failed to elect on the day designated, they might do so at any

other day, to be regulated by the rules and by-laws of the corporation. The failure to pay assessments, incurred a for-feiture of the stock; and if the bank was not organized and put into operation in two years after the passage of the Act, the corporate privileges were forfeited.

Books of subscription to the capital stock were opened, and the citizens of Whitfield and Murray Counties were invited to subscribe. The small book in which the names of the sub-scribers were entered, contained a caption to the effect, that the subscribers obligated themselves to pay such instalments as the directors might assess; and further, that the directors were authorized to transcribe or transfer to any other book, the names and number of shares subscribed for by each indi-vidual.

The whole amount of stock subscribed for, was 1546 shares, or $154.600. Of that amount Morris, High and William K. Moore subscribed for 1230 shares, or $123.000; and they procured the transfer or control of 231 shares more, making the whole amount owned and controlled by them 1451 shares; and leaving 95 owned by others. Of this, Sapp, one of the relators, owned 50 shares; Wells, another, 20 shares; and Underwood, ten shares.

Sometime thereafter, to-wit: on the 29th of July, 1854, Morris, High and Moore relinquished 1410 of their shares to Samuel F. Dickinson, and entered his own name in lieu of theirs, upon the new book for that number of shares; and the names of all the original stockholders, together with the number of shares owned by each, respectively, were trans-ferred to the new book, in which the name of Dickinson was entered, except that of Wells; that after the subscription had closed, Morris, High and Moore subscribed for the re-maining shares. The reason why Wells' name was omitted was, that High, his partner and intimate friend, (Wells being absent from home at the time,) took upon himself the respon-sibility of withdrawing Wells' subscription. When Wells re-turned, he expressed himself dissatisfied with the arrange-

ment; and the offer was made to re-transfer to him the number of shares which he owned.

The $10.000 required in specie was paid in gold, Morris making the *pro rata* advance, to-wit: $600 on the shares not represented. An election was held and the five respondents were chosen, no one voting but Dickinson, who cast 1410 votes of the 1425 represented at the meeting. No notice was given to the relators. White, Wells and Sapp were absent at the time. Underwood was in town during the day; and agreed, in the morning, to sell his shares, receiving his share of the *bonus* or premium on the stock, but retracted his offer, remarking, that it would take $100 to buy his stock.

On the evening of the day on which the election was held, Morris informed Underwood of what had transpired; and that he had advanced for him, on his stock, $66 66$\frac{2}{3}$; and he expressed no dissent or dissatisfaction, but promised to refund the money the next day. He afterwards assigned, as a reason why he did not comply with his promise, that he was threshing wheat. None of the relators ever paid back to Morris the per centage which he advanced for them; nor did any other act, except that of originally subscribing for the stock.

The $10.000 paid in gold to the commissioners, was turned over to the directors. And on the 14th of September, 1854, $40.000 more was paid in by Dickinson on the 1410 shares owned by him.

Relators have been offered back their stock, or to be released from all liability, and to be paid the premium on their shares received from Dickinson.

When the first bills were issued, the word "of" Dalton was left out of the name of the bank, by mistake of the engraver. It has since been corrected. In September, 1854, the directors called upon the stockholders to pay in, in December thereafter, 26$\frac{2}{3}$ per cent. on their stock, which was duly published. Underwood, Sapp, Welborne and Ford failing to respond, their stock was declared to be forfeited.

Morris *et al. vs.* Underwood *et al.*

The term of service of the old directors having expired in April, 1855, Morris, High, Anderson, Kibbie and were elected for the next twelve months. Sixty votes were cast by Kibbie, residing out of the State, and 1440 votes by persons living in Georgia.

Should the rule, under this state of facts, have been made absolute ?

In England, notwithstanding the term of office has expired 'for which the incumbent has been elected, who is sought to be removed, still, the Courts of that country will grant leave to file the information for the purpose of inflicting a fine for the usurpation; and that, too, perhaps, where no judgment of *ouster* can be awarded. It will be found, however, that even there, this is only done in those cases where the office illegally held, is one of a public nature, such as mayor, &c. But the American Courts, from the peculiarity of their constitutions, laws and forms of government, or for some other cause, have, with great unanimity, repudiated this doctrine of imposing a penalty. It has never been enforced in this State, even where the proceeding was directly at the instance of the State. Much less would it be in a case like this, where the effort making is not to forfeit the charter of the bank, but to redress the wrongs of the relators *within* the corporation. In such a case, it is strictly a *civil* proceeding.

In this case, the term for which these directors were elected, had expired by efflux of time, six months before the rule was made absolute. There could, therefore, be no judgment of amotion rendered. And if no fine could be inflicted, why order the information to be filed ? Why trouble the country with a trial which could result in nothing beneficial to the applicants, or prejudicial to their opponents ? In New York and Massachusetts, the information has been refused when the time must expire, before the inquiry would have any effect, leaving the parties to their common remedies. (*Angel & Ames on Corporations,* 436–'7.) Much less, then, will the suit be entertained, where the term of office has already expired.

There are many matters in this record which might be invoked to justify this conclusion. The relators claim but a small portion of this stock—80 out of 1500 shares. Whatever irregularity, therefore, may have crept into the election from want of notice or otherwise, their vote could not, by any possibility, have changed the result.

Again. They have acted capriciously in relation to their stock, refusing either to relinquish or pay any instalment upon it. And what difference is it to them or any one else, whether the subscription remains on the little pocket book in which it was originally entered, or has been transferred to another, as they, themselves, stipulated and agreed might be done ? We cannot but consider this, and many of the other irregularities complained of, as entirely frivolous; especially the omission by the engraver, in the first issue of bills, of the word " of " in the title or style of the bank.

Besides all this, it is not pretended that the directors elected were not capable and honest, or that the public is likely to be injured by their misconduct.

When we see, then, that the success of this application would tend to the dissolution of this charter, indeed, *must* inevitably produce this result—because, if the first organization is declared void, the two years will have passed, limited by the law, within which the bank was to go into operation— we repeat, that in view of all these circumstances, and the further fact, that no attempt is made by the State, through its constituted organs, to revoke the franchise which it has granted, we cannot doubt but that it was error to allow the *quo warranto* information to be filed.