Hillsborough,
  Dec., 1898.

KIMBALL & a. v. NEW ENGLAND ROLLER GRATE CO. & a.

STATE (ex rel. KIMBALL & a.) v. WILLIAMS & a.

Shares of stock issued to the promoters of a corporation illegally and without consideration, and by them transferred to be held for the benefit of the corporation, cannot be legally disposed of at less than their par value unless sold at auction for non-payment of assessments.

The directors of a corporation have no authority to issue its stock for the purchase of patents pursuant to engagement in a business foreign to that specified in the articles of incorporation and to which the stockholders have not assented.

A non-assenting stockholder may maintain a bill in equity to set aside a fraudulent contract entered into by the directors of a corporation, and for the cancellation of certificates of stock in the hands of third parties without consideration, issued in pursuance thereof.

Where stock of a corporation is transferred to it as a gift, the directors have no authority to give it away, sell it for less than the par value, or use it for engaging in a business other than that specified in the articles of incorporation.

A stockholder is not entitled to vote at a meeting of the corporation upon shares originally sold for less than their par value.

THE FIRST CASE is a bill in equity brought by George E. Kimball, J. E. Rider, and W. H. Rider against the Grate Company, H. S. Williams, F. C. Heath, Frederick Atherton, J. C. Johnson, E. B. Stillings, C. B. Ames, and A. B. Tuttle, alleging, as amended, that the defendants Williams, Heath, Atherton, and Johnson, as directors, had illegally and fraudulently issued to Williams a certificate for 813 shares of stock in the corporation upon an illegal contract, and that he had illegally and fraudulently transferred said stock to the defendants Stillings, Ames, and Tuttle, who now hold the same.

The prayer of the bill is that the contract with Williams be declared void, and the illegally issued stock cancelled.

The defendants filed a demurrer upon the grounds (1) that the plaintiffs had a plain and adequate remedy at law, and (2) that the bill was multifarious. They also answered to the merits, still insisting upon their demurrer.

THE SECOND CASE is an information in the nature of a quo warranto, filed at the relation of the plaintiffs after the hearing upon the bill in equity, praying that Williams, Heath, Atherton, and Johnson be ousted from the office of directors of the company,

and that the plaintiffs be declared elected thereto. The defendants pleaded a justification. Facts found by a referee.

January 3, 1889, the defendants Williams and Johnson, being the owners of a patent for a roller grate, and desiring to form a corporation for its operation in New England, associated with themselves three other persons and organized the New England Roller Grate Company, under the provisions of the General Laws of this state. The purposes for which the corporation was formed were to manufacture and vend said grates in New England; to purchase other letters patent; to sell letters patent or any part thereof, and license other parties to use, make, or vend the invention in such place or places in said territory as might be deemed advisable; to purchase real and personal estate; and, generally, to do all things necessary for the proper management and advancement of the business and interests of the corporation. The capital stock was fixed at $30,000, divided into shares of ten dollars each.

Upon the organization of the corporation, on the same day three shares of stock were issued, — one each to Johnson, Williams, and one Falls, who was merely a figurehead. At the same meeting it was voted to buy of Johnson and Williams their patent and pay therefor 2,997 shares of the corporate stock; and a certificate was thereupon made out to them accordingly, which was never removed from the certificate book. On the same day, Williams and Johnson, by assignment on the back of the certificate, transferred to Williams, as trustee for the benefit of the corporation, 1,497 of the 2,997 shares, to be held by him and his successor in the office of treasurer, subject to the order and disposition of the directors. This certificate also was never removed from the stock certificate book; and at various times the directors passed votes in which these 1,497 shares were designated as treasury stock.

The referee finds that at the time of the organization of the corporation only 1,503 shares were issued for value, and that the pretended issue of the remaining 1,497 shares was without consideration and was illegal.

January 1, 1898, there were 813 of the 1,497 shares on hand which had not been sold. On that day, at a directors' meeting, it was voted to buy of the defendant Williams his half interest in the original patent and also his half of a later patent for the territory outside of New England. Williams was to give a clear title to the patents and was to receive the 813 shares of stock at $4.50 per share, the notes of the corporation for a certain sum, and a percentage of the profits for a term of years. He had previously sold to Kimball the other half of his patent outside of New England, stipulating that neither he nor Kimball should " have any right or power to make any license or other privilege

under or relating to said patents without all the owners of the patent join in the same in writing."

Immediately after the meeting of January 1, a formal contract was made with Williams for the purchase of his half interest, and notes of the company and a certificate for the 813 shares at $4.50 per share were executed and delivered to him. He has never made a formal assignment of the patent to the company, but is willing to do so. The directors of the company at this time were the defendants Williams, Johnson, Atherton, and Heath, and the plaintiff J. E. Rider. Williams was also treasurer and general manager of the company, and secretary of the board of directors. At a meeting of the directors held in March, 1898, the transactions of January 1 were ratified. Rider was notified of these meetings, but not of their object, and did not attend either of them. The action of the directors in January and March has never been ratified by or submitted to the stockholders.

In February and March, 1898, Williams transferred the 813 shares to the defendants Stillings, Ames, and Tuttle. The plaintiffs first learned of these transfers at the annual meeting in May, and of the contract with Williams on June 1.

The referee finds that the contract of January 1 was not an advantageous one for the company, that it was fraudulent in fact, and that the transfers of stock to Stillings, Ames, and Tuttle were without valuable consideration and for the purpose of enabling Williams to vote the stock in his interest at the annual election in May.

At the stockholders' meeting in May, the stock of Stillings, Ames, and Tuttle was voted with that of the other defendants for the election of a board of five directors, while that of the plaintiffs was voted for the election of a board of three. Counting the votes of Stillings, Ames, and Tuttle, the vote was for five. Excluding such votes and assuming the validity of 500 shares of stock owned by the Riders and hereinafter referred to, it was for three. The chairman declared the vote to be for the election of a board of five. On the ballot for directors, those who had voted for a board of five voted for the defendants Williams, Heath, Atherton, and Johnson, and the plaintiff J. E. Rider; and those who had voted for a board of three voted for Kimball, J. E. Rider, and W. H. Rider. The chairman declared Williams, Heath, Atherton, Johnson, and J. E. Rider elected. The plaintiffs seasonably filed a protest against the stock of Stillings, Ames, and Tuttle being voted upon and against their votes being counted.

The stock owned by the Riders is a part of the 1,497 shares. One hundred shares of this they bought of the company, paying par therefor, and the remainder (500 shares) they bought of third

parties to whom it had been sold by the company for less than par. It did not appear that the Riders did or did not know of this fact. Kimball, as president, signed the certificates of stock that were issued when the Riders had transfers made of their purchases from third parties.

J. E. Rider has been a director since 1895, and W. H. Rider was a director from May, 1896, to May, 1897. At a directors' meeting held March 13, 1897, at which both the Riders were present, it was voted to sell the treasury stock "at any reasonable price." No stock was sold under this vote.

By agreement of parties, the *quo warranto* proceeding was submitted upon the evidence taken at the hearing upon the bill in equity, so far as the same may be admissible, and the additional evidence that the returns of the company to the commissioner of corporations for Massachusetts, some of which were signed and sworn to by the plaintiffs, stated that the whole capital stock had been paid in.

At the stockholders' meeting in May, 1898, when the board of directors was elected, the defendants voted 1,598 shares, and the plaintiffs 1,000 shares.

*Charles W. Hoitt* and *Isaac W. Smith*, for the plaintiffs.

*Walter C. Harriman*, for the defendants.

BLODGETT, C. J. In any permissible view, the validity of the issue of the 813 shares cannot be sustained. Numerous reasons lead to this conclusion. One is, that these shares constituted a part of the 1,497 shares, the issue of which is found by the referee upon competent evidence to have been without consideration and void. Such being the fact, that issue must be regarded as if it had never been made, and consequently no part of the shares constituting the issue could be reissued, even to *bona fide* purchasers, except upon payment of the par value, or $10 per share, unless at auction for non-payment of assessments; whereas, the sale to Williams was for $4.50 per share. "No corporation shall sell or dispose of any of the shares of its capital stock at a price less than the par value thereof, except in sales of shares at auction for non-payment of assessments" (P. S., c. 149, s. 9); and "if a corporation . . . issues certificates of stock when the par value of the shares represented by the certificates has not been fully paid to its treasurer, all certificates issued for such unauthorized stock shall be void." *Ib.*, c. 273, s. 11.

Another reason is, that the shares were issued to Williams for the purchase of patents to engage in business outside of New England, contrary to the corporation articles of agreement, foreign to the business in which the corporators and their succes-

sors, the stockholders, agreed to engage, and which could not be changed without the consent of all the stockholders. *Dow* v. *Railroad*, 67 N. H. 1–68. The contract with Williams was never submitted to the stockholders for approval; nor is there any ground to claim that the plaintiffs in any manner assented to it.

Still another reason is, it is found as a fact that the Williams contract, on account of which the shares in question were issued, was not an advantageous one for the corporation and was fraudulent in fact. As such, it will be set aside upon a bill in equity in behalf of a non-assenting stockholder. *Pearson* v. *Railroad*, 62 N. H. 537. And not only will the contract be set aside, but as the issue of the stock was in connection with and constituted a part of the same fraudulent transaction, it was not simply illegal as to Williams, but it was also illegal as to Stillings, Tuttle, and Ames, who, it is found, were not purchasers for a valuable consideration; and consequently it is the right of the plaintiffs to have their certificates cancelled.

Finally, it may be observed that even if the defendants' contention — that the transfer of the 1,497 shares from Johnson and Williams was a gift to the corporation and subject to the order and disposition of the directors — be adopted, it cannot avail them, because the directors would in that case be bound to execute the trust in good faith and for the best interests of the corporation. They could neither give away the stock, sell it less than par, nor for engaging in business outside that specified in the corporate articles of agreement.

In the second case it is apparent that the *quo warranto* proceeding, if sustained, will result in little or no practical benefit, for the reason that the defendants' term of office is so near its expiration; but without regard to this consideration (as to which see *Morris* v. *Underwood*, 19 Ga. 559; *People* v. *Sweeting*, 2 Johns. 184; *State* v. *Jacobs*, 17 Ohio 143), or to the further one of the plaintiffs' motives (*State* v. *Brown*, 5 R. I. 1; *Rex* v. *Dawes*, 1 W. Bl. 637), we are of opinion that the information must be dismissed.

It is found by the referee that at the annual meeting of the corporation on May 3, 1898, the defendants voted 1,598 shares, and the plaintiffs, 1000. Deducting the 813 shares of Stillings, Ames, and Tuttle, 785 shares, to which no objection was then or is now made, were voted by and for the defendants. But 500 shares voted for the plaintiffs by the Riders (and acquired by them under circumstances which should at least have put them upon inquiry) were illegaly voted, because it is found that they had been originally sold by the company less than par, in violation and contravention of the statute provisions before cited. See, also, *Clark* v. *Lumber Co.*, 59 Wis. 655; *Clark* v. *Pease*, 41 N. H. 414, 422. Deducting these 500 shares, here was a valid

majority against the plaintiffs on all motions, elections, and other matters at the meeting. This being so, the election will not be set aside. It is superfluous to cite authorities to such a proposition, but see 1 Cook Stock & Stockh., *s.* 620, and 1 Mor. Corp., *s.* 485.

*Decree for the plaintiffs in the first case.*

*Information dismissed in the second case.*

PEASLEE, J., did not sit: the others concurred.